**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| MEGDAL ASSOCIATES, LLC,<br><br>                         Plaintiff,<br>and<br><br>DEWERT ANTRIEBS-UND<br>SYSTEMTECHNIK, GmbH & CO. KG,<br><br>          Involuntary Plaintiff,<br><br>               vs.<br><br>LA-Z-BOY INCORPORATED,<br><br>                    Defendant. | Civil Action No.<br><br><br>Filed Electronically<br><br><br><br>**JURY TRIAL DEMANDED** |

### COMPLAINT

Plaintiff, Megdal Associates, LLC ("Plaintiff" or "Megdal Associates"), by and through its undersigned attorneys, hereby files this Complaint against Defendant La-Z-Boy Incorporated ("Defendant" or "La-Z-Boy"), and alleges as follows:

### OVERVIEW

1.     This action is brought by Megdal Associates for La-Z-Boy's willful infringement of Megdal's patent rights; for La-Z-Boy's failure to pay royalties due to Megdal Associates under the parties' 2002 Agreement (Exhibit A hereto), and failure to issue royalty reports to Megdal Associates as required by said Agreement; for La-Z-Boy's refusal, twice, to allow Megdal Associates to conduct the audit of La-Z-Boy's sales records expressly permitted by the 2002 Agreement; and for La-Z-Boy's willful and malicious misappropriation of Megdal Associates' trade secret information.  By this action, Megdal Associates also seeks a declaratory judgment

that Megdal Associates alone owns by assignment several U.S. and foreign counterpart patents and patent applications covering "improvements of any type" within the meaning of the 2002 Agreement, patents and applications that La-Z-Boy presently claims to own. Megdal Associates seeks all lawful damages and other monetary and equitable relief to which it may be entitled due to La-Z-Boy's bad faith refusal to acknowledge and respect Megdal Associates' intellectual property and contract rights, all as detailed hereafter.

2.     The technology at issue is used to automate the movement of parts of so-called "motion furniture," which includes recliners, love seats, sofas and sectionals.[1] The automation is accomplished through use of an electric motor and associated hardware that are combined to form a "drive system."

3.     La-Z-Boy seating products have historically had footrests and backrests that move in response to manual exertion by the seat's occupant.

4.     For many years, the footrest on La-Z-Boy products has been extended and retracted by the occupant manually rotating the wooden handle on the side of the furniture.

5.     For many years, the backrest on La-Z-Boy products has been moved by the occupant exerting pressure on his or her back, while holding and pushing the armrests for leverage.

6.     The technology at issue herein now allows these movements to be achieved by pressing buttons instead of using manual exertion. When an occupant of "power motion furniture" presses these buttons, the electrically powered drive system causes movement of parts of the furniture such as the footrest and backrest.

7.     The technology at issue herein is owned by Megdal Associates, not La-Z-Boy.

---

[1] In the trade, motion furniture generally refers to a category of home furniture products on which some part, such as the footrest, backrest or other part, moves. Stationary furniture, in contrast, refers to furniture where no part of it moves.

## THE PARTIES

8.     Plaintiff Megdal Associates is a limited liability company organized under the laws of the Commonwealth of Pennsylvania, having its principal place of business in Boca Raton, Palm Beach County, Florida.

9.     On information and belief, involuntary plaintiff Dewert Antriebs und Systemtechnik & Co. GmbH, KG ("Dewert") is an entity formed under the laws of the Republic of Germany, having its principal place of business in Kirchlengern, Germany.

10.     Dewert is named as an involuntary plaintiff herein because it and Megdal Associates are co-owners of one U.S. patent asserted against La-Z-Boy, and Dewert has declined to voluntarily join Megdal Associates as a co-plaintiff as to the one count for patent infringement involving the jointly owned patent.  However, pursuant to a written agreement between Dewert and Megdal Associates signed in 2003, Dewert has consented to Megdal Associates enforcing this patent, and recovering any relief therefor, by itself.

11.     Defendant La-Z-Boy is a corporation organized under the laws of the State of Michigan, having its principal place of business in Monroe County, Michigan.

## JURISDICTION AND VENUE

12.     This action arises under the patent laws of the United States, Title 35 of the United States Code, the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and under Florida law.

13.     This Court has original subject matter jurisdiction under 35 U.S.C. §281 and 28 U.S.C. §§ 1331, 1332 and 1338(a) and (b), and supplemental jurisdiction over related state law claims under 28 U.S.C. § 1367.  Venue is proper in this District pursuant to 28 U.S.C. § 1400 and due to La-Z-Boy's consent under the 2002 Agreement.

14.     The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15.     The Plaintiffs and the Defendant are citizens of different states within the meaning of 28 U.S.C. § 1332.

16.     This Court has general and specific personal jurisdiction over the parties under the Constitution of the United States and the laws of the State of Florida, including without limitation Fla. Stat. § 48.193.

17.     La-Z-Boy has had systematic and continuous contacts with the State of Florida, including without limitation by placing its products (including the specific powered motion furniture products at issue) into the stream of commerce in Florida and this District, by operating or licensing others to operate retail stores in Florida and in this District, and by other acts, including but not limited to sending company representatives/employees to Paul Megdal's home in Boca Raton, Florida, to learn the details of the Megdal Associates trade secrets and inventions at issue herein, and by entering into a 2002 Agreement with Megdal Associates pertaining thereto, which agreement is expressly governed by Florida law and by which La-Z-Boy has "consent[ed] to [the state and federal courts of Palm Beach County, Florida] exercise of personal . . . jurisdiction over [it]."  La-Z-Boy has, through the foregoing, purposefully availed itself of the benefits and protections of Florida law.  Dewert has communicated with and sent Megdal Associates samples of products depicted in Exhibit A of the 2002 Megdal Associates-La-Z-Boy Agreement into this District.  Some of Dewert's products that are at issue in this civil action have been sold into this District and used here thereafter.  Said sales and uses in this District support some of the Megdal Associates' allegations of damages resulting from acts of patent infringement as set forth herein.

18.     Under the 2002 Agreement between Megdal Associates and La-Z-Boy, both La-Z-Boy and Megdal Associates have consented to personal jurisdiction and venue being proper in this court, and have waived any right to make objections thereto.  Exhibit A at paragraph 20.01.

### HISTORY OF MEGDAL'S POWERED MOTION FURNITURE

19.     In the 1980s, Paul and Florence Megdal retired to Boca Raton, Florida, after raising their family in Pennsylvania.

20.     The Megdals had owned retail furniture stores to support their family.

21.     Florence Megdal worked side by side with Paul Megdal in the furniture business.

22.     After moving to Boca Raton, Paul and Florence Megdal purchased several La-Z-Boy chairs (recliners) for their home.

23.     From their years in the furniture business, Paul and Florence Megdal considered La-Z-Boy to be a premium brand.

24.     By about 1995, Florence Megdal had become ill.  As a result of her illness, Florence Megdal began experiencing some loss of strength.

25.     Florence Megdal's loss of strength made it difficult for her to manually operate her La-Z-Boy chairs.

26.     In order to properly recline a manually operated La-Z-Boy chair, the seat occupant opens the footrest and lowers the backrest by physical exertion.

27.     Florence Megdal's loss of strength and inability to easily open her La-Z-Boy chairs rendered them not very useful to her.

28.     At the time of Florence Megdal's illness, Paul Megdal observed that his wife needed to rest more frequently than in the past, and that it was becoming increasingly difficult for her to manually operate her La-Z-Boy chairs.

29.     As a result, Paul Megdal began thinking about, and designing, ways to electrically power the reclining function of La-Z-Boy motion furniture, including opening and closing of the footrest.

30.     Paul Megdal had general knowledge of the products available in the furniture industry at the time.  At the time, he was unaware of any electrically powered motion furniture available on the market.

31.     Consequently, Paul Megdal decided to buy several La-Z-Boy chairs, tear them apart and try to design and build electrically powered drive systems to automate the movement of components of motion furniture.

32.     At the time he started on this venture, Paul Megdal was just shy of 80 years old.

33.     On a nearly constant basis, Paul Megdal had three or four pieces of La-Z-Boy motion furniture propped up on makeshift pedestals in his garage, in varying states of disassembly, and a few more similar pieces located within his home, as he worked diligently to solve the challenges facing his wife.

34.     Paul Megdal could see his wife's health continuing to decline. With the decline in Florence Megdal's health, her need for assistance in using her La-Z-Boy chairs became more acute.

35.     After several years of effort, Paul Megdal successfully developed a number of different prototypes that represented different approaches to power drive systems for automating the movement of motion furniture parts such as the footrest.

36.     Paul Megdal attached his prototype power drive systems to Florence Megdal's La-Z-Boy chairs.  These prototypes allowed her to power operate the chairs.

37.     Unfortunately, Florence Megdal passed away not long after Paul Megdal succeeded in getting his prototypes to power operate her La-Z-Boy chairs.

38.     By 1998, Paul Megdal's prototypes had demonstrated proof of concept with respect to power operating the footrest, in that they would extend and retract it (i) repeatedly without fail, (ii) at the right speed (not too slow and not too fast), (iii) with the right amount of power considering the varying weight of an occupant's legs that could be resting on it, (iv) with very little sound, (v) smoothly, (vi) in a manner that allowed for stopping the footrest at any point between the fully closed and fully opened positions, (vii) in a manner that allowed for backrest reclining, either simultaneously or sequentially, (viii) in a manner that did not cause binding or misalignment of the pantographic linkage system that extended and retracted the footrest, (ix) at a fairly low cost, (x) in a manner that did not require a complete re-design of the standard La-Z-Boy chair to accommodate the power drive system, and (xi) all at the touch of a button.

39.     In the process, Paul Megdal learned what others had apparently learned before him - it was not very easy to design electrically powered drive systems to successfully achieve all of these functionalities in motion furniture.

40.     Paul Megdal's work of several years was necessary for him to develop the know-how, and devise the trade secret designs and design information, that were critical to achieving these functionalities.

41.     Paul Megdal also understood that his three-person company had no manufacturing capability of its own, and therefore the company had to find furniture and furniture component manufacturers with whom to work.

42.     Paul Megdal was committed to making each of his prototypes as effective and inexpensive as possible, so he continued to refine them.

43.     On information and belief, at the time that Paul Megdal was creating his designs and design information in the mid to late 1990s, there had been some prior attempts by furniture manufacturers to electrically power the extension and retraction of the footrest.

44.     On information and belief, the prior attempts to automate the extension and retraction of the footrest were unsuccessful in the sense that no electrically powered footrest systems were being sold in the United States as of the late 1990s.

45.     On information and belief, La-Z-Boy had made prior efforts to design a commercially successful electrically powered motion furniture product.

46.     On information and belief, La-Z-Boy's prior efforts were not successful for several reasons, one of which was due to an unreliable design.

47.     On information and belief, La-Z-Boy considered its prior design "obsolete" by 1986.

48.     On information and belief, Paul Megdal was the first United States inventor to come up with electrically powered footrest systems that were both technologically and commercially successful.

49.     For the past 13 years, starting at a time after La-Z-Boy first met Paul Megdal, La-Z-Boy has been selling electrically powered motion furniture on a continuing basis.

50.     On information and belief, for years prior to meeting Paul Megdal in 1999, La-Z-Boy was not selling any electrically powered motion furniture.

51.     On or about April 18, 2000, Paul Megdal formed Megdal Associates with his son and niece, and assigned all of his rights in his designs and design information to the company.

52.     Paul Megdal treated Megdal Associates' designs and design information as valuable, confidential trade secrets and proprietary intellectual property.

53.     Paul Megdal believed that the company's designs and design information could possibly help others like his wife, as well as disabled people, to comfortably and easily enjoy using motion furniture.

54.     Paul Megdal believed that Megdal Associates' designs and design information could be made appealing to all customer types, including the young and healthy.

55.     On information and belief, the added comfort and ease of operation provided by Paul Megdal's electrically powered furniture designs and design information were seen by La-Z-Boy as major areas of appeal to all consumers.

56.     Megdal Associates' designs and design information derived independent economic value from not being generally known to or readily ascertainable by proper means by other persons who could obtain economic value from their disclosure or use.

57.     Megdal Associates' designs and design information were subject to efforts to maintain their secrecy.

58.     For example, in April 1999, prior to Paul Megdal first disclosing some of his trade secrets to a La-Z-Boy company, a Confidentiality Agreement was signed.  See Exhibit B hereto.

59.     Additionally, in the process of working with prospective manufacturers, Megdal Associates required a confidentiality agreement from each entity to whom it disclosed its designs and design information.

## PAUL MEGDAL'S INITIAL DEALINGS WITH LA-Z-BOY

60.     In 1998 or 1999, Paul Megdal decided to contact Pat Norton of La-Z-Boy, who was, at the time, La-Z-Boy's Chairman of the Board.

61.     Paul Megdal wanted to see if La-Z-Boy had interest in evaluating Megdal's prototype designs and design information with an eye toward licensing it.

62.     Paul Megdal did contact Pat Norton for these purposes.

63.     On information and belief, Pat Norton advised Paul Megdal that La-Z-Boy did not have any electrically powered motion furniture products at the time, and, as a result, La-Z-Boy would be interested in evaluating Paul Megdal's prototype designs and design information.

64.     Around this same time, Paul Megdal's daughter traveled to the United Kingdom. While there, his daughter met Mr. Tom Brown ("Brown"), the head of Centurion Furniture, PLC ("Centurion").

65.     On information and belief, at the time Paul Megdal's daughter met Brown, Centurion had become associated with La-Z-Boy, and was holding itself out as a La-Z-Boy company.

66.     On information and belief, Centurion was responsible for sales of La-Z-Boy product in the United Kingdom and other parts of Europe.

67.     On information and belief, La-Z-Boy's Pat Norton and La-Z-Boy's Tom Brown discussed with each other the possibility of La-Z-Boy working with Paul Megdal.

68.     On information and belief, in early spring 1999, La-Z-Boy's Tom Brown contacted Paul Megdal and told Megdal that Brown was coming to the United States in April 1999, and that Brown would like to come to Boca Raton, Florida, to review Megdal's designs and design information.

69.     Paul Megdal told Brown that he was welcome to come to Boca Raton, but that Megdal's lawyer would require that a Confidentiality Agreement be signed first.  Brown agreed to sign an appropriate Confidentiality Agreement.

70.     On April 21, 1999, Brown came to Paul Megdal's home in Boca Raton.  Upon arrival, but before he was shown anything, Brown was given the Confidentiality Agreement.

71.     Brown asked to make two changes to the Agreement before signing.

72.     The changes were made pursuant to Brown's request.

73.     After Brown's requested changes were made, Brown and Paul Megdal each signed the Confidentiality Agreement on April 21, 1999, outside of Paul Megdal's home.  Exhibit B.

74.     Immediately after Brown signed the Confidentiality Agreement, Paul Megdal took Brown into his garage and home, and disclosed to Brown the different prototypes that Megdal had developed to that point.

75.     As he saw Paul Megdal's prototypes put into operation, Tom Brown expressed enthusiasm for their clever design and their potential for his market in Europe.  As he watched these power systems operate, Brown excitedly uttered "brilliant" and "ingenious" repeatedly.

76.     Brown immediately expressed interest to Paul Megdal in working with him to adapt Megdal's prototypes into designs that could be produced in quantity, and in having La-Z-Boy enter into a license agreement with Megdal Associates with respect thereto.

77.     Brown wanted to do these things as soon as possible, as he felt certain that these designs and the design information could be used to make commercial goods that would get a very favorable response from his customers in Europe.

78.     Brown also indicated to Paul Megdal that Brown would discuss these subjects with others at La-Z-Boy's corporate headquarters in Michigan, to see if the decision-makers in the United States wanted to do the same thing in the North American market.

79.     On information and belief, after Brown spoke with others at La-Z-Boy's corporate headquarters in Monroe, Michigan, La-Z-Boy was interested in discussing with Megdal Associates adapting the designs and design information into commercial embodiments that could be mass produced for all parts of the world where La-Z-Boy sold products.

80.     La-Z-Boy was interested in securing to itself the "exclusive" worldwide right to use Megdal Associates' trade secret designs and design information in those parts of the world where La-Z-Boy sold its products, in exchange for royalty payments being made and other consideration being given to Megdal Associates.

81.     La-Z-Boy identified two manufacturers who might assist Megdal Associates in adapting Paul Megdal's prototype designs and design information for commercialization: (i) involuntary plaintiff Dewert Antriebs und Systemtechnik, GmbH & Co. KG, a division of Phoenix Mecano AG ("Dewert"), and (ii) Leggett & Platt Incorporated of Missouri ("L&P").

82.     Dewert and L&P were recommended by La-Z-Boy because they were experienced product manufacturers that might assist in adapting Megdal's prototype designs and design information so that they could be manufactured in quantity.

83.     Prior to Megdal Associates negotiating any product development or manufacturing agreements with either of these two manufacturers, however, Megdal Associates required Dewert and L&P to sign Confidentiality Agreements.

84.     Each of Dewert and L&P in fact signed a Confidentiality Agreement with Megdal Associates.  Among other things, these Confidentiality Agreements obligated each of Dewert and L&P to treat Megdal Associates' designs and design information confidentially.

85.     The Confidentiality Agreements further required that Dewert and L&P assign to Megdal Associates all intellectual property rights in any improvements or enhancement they made, since each contemplated that there would be changes to Megdal Associates' designs and design information so that they could be made in commercial quantities and so that they would perform effectively over the life of the motion furniture products on which they would be used.

86.     Part of the business rationale for this arrangement was that Megdal Associates would profit by owning and controlling all intellectual property rights in the original and modified power motion furniture designs, while Dewert and L&P would profit by manufacturing the relevant components for La-Z-Boy.

87.     The 2000 Megdal Associates - Dewert Confidentiality Agreement provided in pertinent part that "[Dewert] further agrees to, **and hereby does, assign to Megdal Associates** all improvements or enhancements to the Design Information or Designs first conceived by any of its officers, directors, employees or authorized agents after [Dewert's] receipt of the Design Information and Designs, where such improvements or enhancements are based on or derived from, at least in part, one or more features of the Design Information or Designs."  See Exhibit C hereto; emphasis added.

88.     The 2001 Megdal Associates – L&P Confidentiality Agreement provided in pertinent part that "[L&P] further agrees to, **and hereby does, assign to Megdal Associates** all improvements or enhancements to the Design Information first conceived by any of its officers, directors, employees or agents after [L&P's] receipt of the Design Information."  See Exhibit D hereto; emphasis added.

89.     The assignment language in the two Confidentiality Agreements is considered under applicable law to be language of "a present assignment" of future intellectual property, whether in the form of future improvements or enhancements, or any  patent rights thereon.

90.     The import of language of a present assignment in these two agreements is that all rights in any improvement or enhancements and inventions created by Dewert or L&P, and any patents thereon, are automatically owned solely by Megdal Associates, by operation of law.  *See Preston v. Marathon Oil Co.*, 684 F.3d 1276 (Fed. Cir. 2012)("Because the assignment clause in

the April Employee Agreement stated that the employee agrees to "hereby assign" all "Intellectual Property," it is an express assignment of rights in future inventions that automatically assigned rights to Marathon without the need for any additional act."); *Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys.*, 583 F.3d 832, 841 (Fed. Cir. 2009)(same); *DDB Technologies v. MLB Advanced Media*, 517 F.3d 1284 (Fed. Cir. 2008)("Applying federal law, we have held that whether an assignment of patent rights in an agreement such as the one in this case is automatic, requiring no further act on the part of the assignee, or merely a promise to assign depends on the contractual language. If the contract expressly grants rights in future inventions, "no further act [is] required once an invention [comes] into being," and "the transfer of title [occurs] by operation of law." *FilmTec Corp.*, 939 F.2d 1568 at 1573 (contract provided that inventor "agrees to grant and does hereby grant" all rights in future inventions); *see also Speedplay*, 211 F.3d at 1253 (contract provided that employee's inventions within the scope of the agreement "shall belong exclusively to [employer] and [employee] hereby conveys, transfers, and assigns to [employer] . . . all right, title and interest in and to Inventions")); *Speedplay, Inc. v. Bebop*, 211 F.3d 1245, 1249 (Fed. Cir. 2000)(same); *Arachnid, Inc. v. Merit Industries, Inc.*, 939 F.2d 1574 (Fed. Cir. 1991)(same).

91.     The use of language of a present assignment in both the Dewert and the L&P Confidentiality Agreements meant that that all rights in improvements or enhancements by each of these companies were transferred immediately to Megdal Associates by operation of law, without any further act being required.

### DEWERT AND L&P EACH WORK WITH MEGDAL ASSOCIATES TO ADAPT MEGDAL'S POWERED MOTION FURNITURE DESIGNS FOR MASS PRODUCTION

92.     Dewert is considered a supplier of "actuators," electric motor driven devices that produce the initial force meant to actuate or start the movement of a furniture component.

14

93.     Actuators generally cause movement of furniture components only if they are connected to the furniture and the component in question.

94.     L&P is considered a supplier of under-the-seat "mechanisms," which are analogous to an automobile's chassis.

95.     L&P's mechanisms are, among other things, a series of collapsing and expanding metal parts that link together.  One of the main functions of these mechanisms is to provide the extension and retraction system that moves the footrest.

96.     On information and belief, L&P attaches electric actuators to its mechanisms (including, on information and belief, electric actuators manufactured by Dewert), and L&P supplies the combination to furniture manufacturers such as La-Z-Boy.

97.     On information and belief, L&P, a publicly traded company, had not commercially used electrically powered actuators with its mechanisms before Paul Megdal developed his designs and design information and L&P was exposed to them.

98.     Pursuant to the 2000 Megdal Associates – Dewert Confidentiality Agreement, Dewert made improvements and enhancements to Megdal Associates' trade secret designs and design information, all of which were automatically assigned to Megdal Associates by operation of law.

99.     Pursuant to the 2001 Megdal Associates – L&P Confidentiality Agreement, L&P made improvements and enhancements to Megdal Associates' trade secret designs and design information, all of which were automatically assigned to Megdal Associates by operation of law.

100.     Exhibits A and B to the 2002 Agreement between La-Z-Boy and Megdal Associates are two examples of improvements and enhancements to Megdal Associates' designs and design

information that were made by Dewert, but which are owned by Megdal Associates pursuant to the 2000 Megdal Associates - Dewert Confidentiality Agreement.

101.    On information and belief, one of the three basic designs of a power drive system used by LZB today is supplied by L&P, but is owned by Megdal Associates pursuant to the 2001 Megdal Associates-L&P Confidentiality Agreement (Exhibit D hereto).

102.    All such improvements and enhancements are presently owned solely by Megdal Associates.

## MEGDAL AND LA-Z-BOY ENTER INTO THE 2002 AGREEMENT CONCERNING POWERED MOTION FURNITURE DESIGNS FOR MASS PRODUCTION

103.    After Tom Brown and others within La-Z-Boy had seen some of Megdal Associates' designs and design information in confidence and trust, La-Z-Boy asked Megdal Associates to propose terms for a comprehensive agreement.

104.    La-Z-Boy wanted an agreement that would allow La-Z-Boy and La-Z-Boy's Sublicensees around the world to be able to use Megdal Associates' trade secrets and inventions and related intellectual property rights regarding power motion furniture.

105.    Negotiations between Megdal Associates and La-Z-Boy lasted for well over a year.

106.    La-Z-Boy sent Larry LaPointe, its long-time developer of new motion furniture products, to Boca Raton, Florida, to visit Paul Megdal, in order to examine Megdal Associates's designs and design information.

107.    Effective January 1, 2002, La-Z-Boy and Megdal Associates entered into the 2002 Agreement. Exhibit A.

108.    Under the Agreement, La-Z-Boy was granted the exclusive license by Megdal Associates to use what were called Megdal Associates' "TRADE SECRETS AND INVENTIONS."  *Id*. at paragraph 2.00.

109.    La-Z-Boy was required to "pay Megdal a royalty amount for each unit of a LICENSED PRODUCT that is sold by La-Z-Boy or a SUBLICENSEE (whether free-standing or as part of a piece of motion furniture) as set forth in Table 2 below." *Id*. at paragraph 3.00.

110.    LICENSED PRODUCTS were defined under the Agreement very broadly, as "mean[ing] any and all products made at least in part using any or all aspects of the TRADE SECRETS AND INVENTIONS . . . [and that] [w]ith regard to any patents that are and may become issued at any time to or for the benefit of Megdal related to the TRADE SECRETS AND INVENTIONS, the term "LICENSED PRODUCTS" further includes any and all products that in the absence of this license agreement would infringe at least one claim of such a patent . . ." *Id*. at paragraph 1.02.

111.    Table 2 provided that the "royalty amount" to be paid by La-Z-Boy to Megdal Associates was $9.00 per unit for annual sales of up to 50,000 Units, reduced to $8.00 per unit for each unit sold annually in excess of 50,000 Units.  *Id*.

112.    "TRADE SECRETS AND INVENTIONS" under the Agreement comprise the original "DISCLOSURES" that Megdal Associates made under the April 21, 1999 Confidentiality Agreement (Exhibit B hereto), "together with any improvements made to THE DISCLOSURES by Megdal [Associates], La-Z-Boy or Dewert *or any third party acting to benefit Megdal, La-Z-Boy, or Dewert,* including without limitation those set forth in paragraph 9.01 hereof . . ."  (Emphasis added).

113.    TRADE SECRETS AND INVENTIONS also include "the product depicted in Exhibit A, or an embodiment substantially equivalent thereto, when attached directly to the drive rod inside the base of the recliner." *Id*. at Preamble.

114.    Paragraph 9.01 of the Agreement, titled **Patents**, provides in pertinent part that "***Improvements of any type*** made by La-Z-Boy or any third part acting on its behalf to the TRADE SECRETS AND INVENTIONS shall be the exclusive property of Megdal [Associates], and ***are hereby assigned to Megdal***, but shall be deemed part of the TRADE SECRETS AND INVENTIONS licensed hereunder." *Id*. at paragraph 9.01; emphasis added.

115.    As with Dewert and L&P's agreements, language of a present assignment was used in Megdal Associates' 2002 Agreement with La-Z-Boy, to make sure that improvements of any type made "by La-Z-Boy or any third party acting on its behalf" were owned by Megdal Associates automatically, by operation of law.

116.    "THE DISCLOSURES" first made when Tom Brown visited Paul Megdal in Boca Raton on April 21, 1999 were described as "certain designs, confidential, proprietary and trade secret information pertaining to an electric motor driven mechanism that is adapted for attachment to the drive rod commonly used in La-Z-Boy® recliners having an extendable footrest, for automating rotation of the drive rod to extend and retract the footrest, wherein the mechanism is located inside the cavity defined by the side panel of the recliner mechanism and the upholstered arm of the recliner, including without limitation the products made by Dewert depicted in Exhibits A and B attached hereto."

117.    The power drive system made by L&P, but which is owned by Megdal Associates pursuant to the 2001 Confidentiality Agreement between Megdal Associates and L&P (Exhibit D), is also an "improvement made to THE DISCLOSURES by [a] third party [L&P] acting to

benefit Megdal . . ." within the meaning of the 2002 Megdal Associates-La-Z-Boy Agreement (Exhibit A).

118.    The power drive system supplied by L&P to La-Z-Boy, which in turn is sold to the public by La-Z-Boy as part of the products at issue herein, falls within the definition of TRADE SECRETS AND INVENTIONS in the 2002 Agreement between Megdal Associates and La-Z-Boy.  (Exhibit A).  *Id*

119.    The"Improvements" clause in paragraph 9.01 of the 2002 Megdal Associates-La-Z-Boy Agreement (Exhibit A), and that clause's broad scope ("***Improvements of any type . . .***"), were very consciously and intentionally put into the agreement by the parties.

120.    Like Dewert and L&P, La-Z-Boy recognized that the commercial products that would one day be manufactured in quantity would be adapted from - improvements or enhancements to - the prototypes that Paul Megdal originally created in his garage and home, and that Megdal Associates would own all rights in the same.

121.    La-Z-Boy's "protection" against the breadth of the "improvements" clause came from provisions in the 2002 Agreement that while all "Improvements of any type", are owned by Megdal Associates, they were also licensed back to La-Z-Boy.  See e.g. Exhibit A, paragraphs 2, 3 and 9.

122.    Thus, regardless of the fact that through this provision Megdal Associates would own all continually improved power motion furniture intellectual property developed by or among any of these parties, La-Z-Boy had a contractual right to use all of it – ***but only if it complied with all of the terms of the Agreement, including paying for its  use***.  *Id*. at paragraph 3.

123.    While La-Z-Boy has to pay royalties on all improvements (among other things), it only has to pay a royalty after it has sold a LICENSED PRODUCT and, in the process of making that sale, earned far more for itself in profit than it has to pay Megdal Associates as a royalty.

124.    The parties knew and agreed that this "Improvements of any type" clause was included primarily to protect Megdal Associates.

125.    The parties agreed that the 2002 Agreement would last for 20 years, from its effective date until the end of 2021.  *Id.* at paragraph 8.00.  This provision was also meant to protect Megdal Associates.

126.    Since La-Z-Boy was given the opportunity to learn Paul Megdal's trade secret designs and design information at a time when they were secret, and since it was given the opportunity to be the *exclusive* party to benefit from use of the Megdal Associates's intellectual property, La-Z-Boy was required to pay Megdal Associates for those rights.

127.    The unique opportunity that La-Z-Boy received to be the exclusive company to review and then be authorized to exploit Megdal Associates's valuable trade secrets and inventions, and the "opportunity cost" to Megdal Associates in granting La-Z-Boy an "exclusive" (i.e., Megdal was unable to use the technology itself or license others), were part of what justified La-Z-Boy being required to pay Megdal Associates for a minimum of 20 years and to assign to Megdal all future "Improvements of any type . . ."

128.    La-Z-Boy and Megdal Associates further agreed that the term of the 2002 Agreement could even extend past 20 years if "a patent covering the LICENSED PRODUCTS then being sold by La-Z-Boy and any SUBLICENSEE [are] still in force, whereupon La-Z-Boy shall be obligated to pay royalties under Section III as if those terms were still in effect until the expiration of any such patents."  *Id*.

129.     To provide a vehicle for Megdal to check whether La-Z-Boy was accurate in its royalty payments and record-keeping, Megdal was given an unconditional right to "inspect all [records of all operations affecting royalty payments hereunder]" "not more than once per year." *Id*. at paragraph 5.

130.     And, La-Z-Boy accepted the obligation throughout the term of the Agreement, and for three years after its termination, to "keep accurate records of all operations affecting royalty payments hereunder." *Id*.

131.     In the event that an inspection pursuant to paragraph 5 of the 2002 Agreement reveals that royalty payments have been deficient to any degree, then La-Z-Boy has to make all past due royalty payments immediately and pay interest on these late royalty payments. *Id.*

132.     La-Z-Boy has to "further reimburse Megdal for all costs and expenses reasonably related to identifying and rectifying the deficiency, including without limitation all expenses of the inspection" if the deficiency in royalty payments exceeds 10% of the amount due and owing. *Id*.

133.     Contractual audit rights and penalties for underpaying license fees are common features of intellectual property agreements, especially where, as here, only one party has all of the relevant information.

### LA-Z-BOY PAYS MEGDAL ASSOCIATES ROYALTIES FOR SELLING LICENSED PRODUCTS THAT COMPRISE POWERED MOTION FURNITURE

134.     Starting in 2002, La-Z-Boy began making quarterly royalty payments to Megdal Associates under the 2002 Agreement.

135.     La-Z-Boy's initial payments covered periods of time prior to the effective date of the Agreement, because the parties agreed that La-Z-Boy had started selling LICENSED PRODUCTS before the parties completed and signed the Agreement.

136.    Under paragraph 3.02 of the 2002 Agreement, La-Z-Boy is required to "[to] furnish to Megdal a written statement in such detail as Megdal may reasonably require of all amounts due pursuant to Paragraph 3.00 herein for the quarterly royalty periods . . ." with its royalty payments.

137.    With its quarterly royalty payments, La-Z-Boy generally provided a report representing how many units of LICENSED PRODUCT were sold that quarter, and which of La-Z-Boy's operations around the world made the sales.

138.    La-Z-Boy has never provided royalty reports to Megdal Associates that had a sufficient degree of detail to show which specific power motion furniture products La-Z-Boy deemed to be royalty-bearing, or whether La-Z-Boy was selling any power motion furniture products that it considered to not be royalty-bearing.

139.    Royalty payments to Megdal Associates started somewhat slowly, as La-Z-Boy, on information and belief, only offered about 4 to 6 styles of power motion furniture products for sale at the outset of the 2002 Agreement.

140.    On information and belief, between 2002 and about 2010, La-Z-Boy offered between about 4 to 10 styles or models of power motion furniture.

141.    Nonetheless, royalty payments picked up after the first couple of years, according to La-Z-Boy's reports.

142.    Between 2002 and 2010, La-Z-Boy paid Megdal Associates a total of nearly $400,000 in royalties.

143.    In 2005, three years after licensing his first inventions, Paul Megdal died at the age of 88.

144.    According to La-Z-Boy, sales of LICENSED PRODUCTS began slowing down just after Paul Megdal died, in or around 2006.

145.    On information and belief, La-Z-Boy provided very little financial support for advertising or marketing its power motion furniture line between 2005 and 2010.

146.    After Paul Megdal's death, the annual amount of royalties paid by La-Z-Boy to Megdal Associates declined most years.  In the last couple of years, La-Z-Boy's royalty payments to Megdal Associates became *de minimis*.

147.    On information and belief, starting in or around 2011 or so, with no notice to Megdal Associates, La-Z-Boy created and then began implementing a plan to try to increase its overall sales by making a greater commitment to power motion furniture than it had for many years before that period.

148.    Megdal Associates did not learn of the increased commitment to power motion furniture from its receipt of increased royalty payments, however.

149.    From 2011 to early 2013, Megdal Associates interpreted La-Z-Boy's *de minimis* royalty payments to mean that La-Z-Boy had withdrawn all commitment to power motion furniture as a viable market segment.

150.    Because Megdal Associates believed that the *de minimis* royalty payments it was receiving were caused by La-Z-Boy's complete abandonment of power motion furniture, Megdal Associates attempted to confirm whether that belief was indeed accurate.

151.    Much to its surprise, Megdal Associates discovered in early March 2013 that La-Z-Boy had not abandoned the market for power motion furniture.

152.    Instead, Megdal Associates learned in early March 2013 that La-Z-Boy was actively creating and introducing to the market a vastly expanded lineup of power motion furniture products, numbering roughly 100 different models.

153.    On information and belief, the number of models or styles of motion furniture in La-Z-Boy's power lineup in the last couple of years has fluctuated near 100.  Sometimes the number of power motion furniture products shown on La-Z-Boy's website has been above that figure, and sometimes the number has been below that figure.

154.    For ease of reference only, Megdal Associates refers to the group of power motion furniture styles or models at issue herein as "100" products, while recognizing that the actual number varies over time.  The evidence produced in this case will reveal the actual number of power motion furniture products sold by La-Z-Boy at different points in time.

155.    On information and belief, although La-Z-Boy has sold approximately 100 models of power motion furniture over the past couple of years, they use one of only three basic designs of power drive systems.

156.    On information and belief, La-Z-Boy calls the three different designs of its 100 power products the (i) Power 10, (ii) Power 440, and (iii) Robertson Entalift.

157.    On information and belief, of the 100 models of power motion furniture products that have been sold by La-Z-Boy in the past couple of years, the majority, if not all, have used drive system components supplied by (a) L&P and Dewert in combination (collectively "the L&P Designs") and/or (b) a company called TiMOTION Technology Co. Ltd. ("TiMOTION"), on information and belief a Taiwan-based importer ("the TiMOTION Design").

**LA-Z-BOY DOESN'T PAY MEGDAL ASSOCIATES ROYALTIES FOR SELLING
LICENSED PRODUCTS THAT COMPRISE POWERED MOTION FURNITURE**

158.    On April 24, 2013, after discovering that not only had La-Z-Boy not abandoned the power motion furniture market, but instead had actually expanded its line of offerings by a factor of approximately 20 times, Megdal Associates' counsel sent an email to La-Z-Boy's counsel questioning why Megdal was not receiving commensurate royalty payments.

159.    In its April 24, 2013 email, Megdal Associates also requested that it be given a chance to conduct a full audit of La-Z-Boy's books and records in accordance with its right to do so under paragraph 5 of the Agreement.  Exhibit A.

160.    La-Z-Boy took nearly two months to send a responsive email to Megdal Associates's email of April 24, 2013.

161.    La-Z-Boy's counsel eventually sent a June 14, 2013 email response, contending that the 2002 Agreement did not cover the 100 power motion furniture products.  The June 14, 2013 email did not address Megdal Associates' request for an audit.

162.    From March 2013 to August 2013, La-Z-Boy dragged its feet on whether it would allow any audit.

163.    Eventually, in August 2013, La-Z-Boy agreed to allow Megdal Associates' counsel to come to the offices of La-Z-Boy's counsel in late September 2013.

164.    La-Z-Boy would not allow Megdal Associates to conduct the full audit requested by Megdal Associates.

165.    Instead, Megdal Associates was only allowed to review 427 pages of records selected by La-Z-Boy or its counsel.

166.    On information and belief, the 427 pages of records selected by La-Z-Boy or its counsel and shown to Megdal Associates' counsel in September 2013 were not all "records of all

operations affecting royalty payments" within the meaning of the 2002 Agreement that then existed.

167.    In connection with the audit, La-Z-Boy specifically refused to produce *sales records* for the 100 power motion furniture models at issue in this case.

168.    On information and belief, La-Z-Boy's sales of the 100 styles of power motion furniture during this last two-plus year period have been substantial.

169.    On information and belief, La-Z-Boy's sales of the 100 styles of power motion furniture over the past couple of years has been one of the fastest growing segments of the company during that period.

170.    La-Z-Boy has reaped the financial benefit from the valuable power motion furniture business segment by infringing and misappropriating Megdal Associates' intellectual property rights and breaching its contract rights.

171.    Megdal Associates disclosed TRADE SECRETS AND INVENTIONS to La-Z-Boy under contractual terms limiting La-Z-Boy's right to use them.   See e.g. 2002 Agreement, Exhibit A, paragraph 6.01.

172.    The 2002 Agreement specifically requires that La-Z-Boy continue to maintain in confidence "any unpublished information related to the TRADE SECRETS AND INVENTIONS furnished by Megdal [Associates]," unless Megdal Associates gives written consent with respect to any of them.  *Id.*

173.    Additionally, La-Z-Boy is expressly precluded from "using" any unpublished information "other than in the manufacture of LICENSED PRODUCTS."  Exhibit A, paragraph 6.01.

174. The manufacture of LICENSED PRODUCT under the 2002 Agreement is one for which payment has been made by La-Z-Boy, *id*. at paragraph 3.00, and which involves "any and all products made at least in part using any or all aspects of the TRADE SECRETS AND INVENTIONS, whether patented or not."

175. The 2002 Agreement between Megdal Associates and La-Z-Boy includes depictions of two particular designs of the TRADE SECRETS AND INVENTIONS, as Exhibits A and B thereto.

176. Exhibit A to the 2002 Agreement depicts a drive design that was sold commercially by La-Z-Boy starting in or around 2001.

177. On information and belief, since 2002 La-Z-Boy has been paying Megdal Associates for the right to use Megdal Associates' intellectual property shown in Exhibit A.

178. Exhibit B to the 2002 Agreement shows a different drive design than the design shown in Exhibit A. The drive system shown in Exhibit B was developed in or around late 1999 or early 2000.[2]

179. To this day, Megdal Associates has not publicly disclosed Exhibit B to the 2002 Agreement, but instead has maintained it as a trade secret.

180. The power motion furniture design shown in Exhibit B to the 2002 Agreement is a trade secret owned by Megdal Associates.

181. La-Z-Boy could lawfully sell products made in accordance with Exhibit A because La-Z-Boy actually paid Megdal Associates under the 2002 Agreement for the right to do so.

---

[2] Megdal Associates does not include the Exhibit B that is part of the 2002 Agreement with this publicly filed document because Exhibit B comprises a Megdal Associates trade secret. Megdal Associates will file Exhibit B under seal when an appropriate protective order is in place. La-Z-Boy has a copy of Exhibit B, and its content is not believed to be in dispute.

182.    La-Z-Boy was not authorized to use the design shown in Exhibit B for any purpose "other than in the manufacture of LICENSED PRODUCTS."

183.    La-Z-Boy was not authorized to sell products "made at least in part using any or all aspects of" Exhibit B unless La-Z-Boy paid Megdal Associates for the right to do so under the 2002 Agreement.  See Exhibit A, paragraphs 6.01, 1.02 and 3.

184.    With regard to Megdal Associates' designs and design information other than that depicted in Exhibit A to the 2002 Agreement, including but not limited to the specific trade secret shown in Exhibit B, La-Z-Boy has not paid Megdal Associates any royalties for any products that use said trade secrets.

185.    Megdal Associates has not consented to La-Z-Boy using the foregoing without paying for that right.

186.    Because Exhibit B has remained a trade secret owned by Megdal Associates, La-Z-Boy has remained subject to the secrecy obligations of the 2002 Agreement with respect to that information.  See Exhibit A, paragraph 6.01.

187.    Megdal Associates' efforts to maintain the secrecy of all of its trade secret designs and design information have been reasonable under the circumstances.

188.    On information and belief, La-Z-Boy, alone or in conjunction with others, has used the trade secret design shown in Exhibit B to the 2002 Agreement in selling power motion products that employ the TiMOTION Design.

189.    On information and belief, La-Z-Boy has not paid Megdal Associates anything for La-Z-Boy's sales of power motion furniture that use the TiMOTION Design.

190.    On information and belief, La-Z-Boy recently started making its own under-the-seat mechanisms.  On information and belief, La-Z-Boy elected to use the TiMOTION actuators with its own mechanisms instead of using actuators from Dewert.

191.    On information and belief, one reason La-Z-Boy recently started obtaining actuators from TiMOTION is because TiMOTION's actuators are cheaper than Dewert's actuators.

192.    On information and belief, one reason La-Z-Boy started making its own under-the-seat mechanisms was because doing so was cheaper than buying all of them from L&P.

193.    On information and belief, La-Z-Boy's decisions to commence using TiMOTION actuators, and start manufacturing under-the-seat mechanisms itself, were part of an effort by La-Z-Boy to reduce its corporate costs and increase its corporate profits.

194.    On information and belief, La-Z-Boy's decision to not pay Megdal Associates for use of Megdal Associates's TRADE SECRETS AND INVENTIONS intellectual property was also part of La-Z-Boy effort to reduce its corporate costs and increase its corporate profits.

195.    On information and belief, La-Z-Boy adds some mechanical connection parts of its own to the TiMOTION actuators to operatively secure the actuator to a drive rod.

196.    On information and belief, La-Z-Boy adds some of its own mechanical connection parts to the actuators used on many of its 100 power motion furniture products now being sold.

197.    By using Megdal Associates' trade secrets without paying for the right to do so, even after demands over the past year by Megdal Associates to the contrary, La-Z-Boy is engaged in willful, intentional and malicious misappropriation of Megdal Associates' trade secrets under Florida law.

198.    La-Z-Boy's conduct in this regard exhibits a reckless indifference to the rights of Megdal Associates and/or a specific intent to harm Megdal Associates.

199.   On information and belief, La-Z-Boy's reasons for not paying Megdal Associates under the 2002 Agreement for sales of the 100 new power motion furniture products, as stated in 2013 correspondence between its counsel and Megdal Associates' counsel, were objectively baseless and subjectively made in bad faith.

200.   On information and belief, La-Z-Boy is trying to take advantage of the size and resource disparity between itself and Megdal Associates, by forcing Megdal Associates to pursue litigation if it wants to get paid for its intellectual property.

201.   La-Z-Boy's 100 power motion furniture products that have been sold and are being sold with the L&P Designs and the TiMOTION Design comprise TRADE SECRETS AND INVENTIONS as defined by the 2002 Agreement, and/or use TRADE SECRETS AND INVENTIONS.

202.   La-Z-Boy's 100 power motion furniture products that have been sold and are being sold with the L&P Designs and the TiMOTION Design fit within the definition of LICENSED PRODUCTS under the 2002 Agreement.

203.   La-Z-Boy's 100 power motion furniture products that have been sold and are being sold with the L&P Designs and the TiMOTION Design comprise "Improvements of any type" within the meaning of paragraph 9.01 of the 2002 Agreement.

204.   On April 23, 2014, counsel for Megdal Associates sent La-Z-Boy a letter, again requesting a full audit under paragraph 5 of the Agreement.  See Exhibit E hereto.

205.   Counsel for Megdal Associates sent a follow up letter on April 25, 2014 with a list of La-Z-Boy products for inclusion in the audit.  *Id.*

206.   Megdal Associates has not requested any other audit of La-Z-Boy in calendar year 2014.

207.    On May 30, 2014, outside counsel for La-Z-Boy, attorney Paul Keller, sent counsel for Megdal Associates a letter rejecting the request for an audit of the scope outlined in the April 23/25, 2014 letters from counsel for Megdal Associates.

208.    Instead, the May 30, 2014 Keller letter offered counsel for Megdal Associates the chance to review the same limited and insufficient scope of documents that La-Z-Boy permitted Megdal Associates to review in response to Megdal's initial audit request of April 2013. *Id.*

209.    In its counsel's May 30, 2014 letter, La-Z-Boy again specifically refused to allow a review of the sales records related to the 100 products at issue herein and which were enumerated by counsel for Megdal Associates in the April 25, 2014 letter. *Id.*

210.    On information and belief, La-Z-Boy has not provided either a royalty report or any royalty payment to Megdal for the fourth quarter of 2013, the first quarter of 2014, and the second quarter of 2014, in breach of its duty to do so under paragraph 3.02 of the 2002 Agreement.

## Count I

### (Breach of Contract)

211.    Megdal Associates repeats and reasserts all allegations contained in Paragraphs 1 through 210 above as if they were stated in full herein.

212.    Megdal Associates has performed all material obligations precedent to enforcement of the 2002 Agreement.

213.    La-Z-Boy has failed and refused to perform all of its obligations under the 2002 Agreement, including, but not necessarily limited to, its (a) underpayment of and failure to pay royalties due to Megdal Associates under the 2002 Agreement; (b) failure to allow Megdal Associates to conduct appropriately requested audits of La-Z-Boy records; (c) failure to

acknowledge Megdal Associates' ownership of patents originally prosecuted by counsel for La-Z-Boy which cover or comprise "Improvements of any type" within the meaning of paragraph 9.01 of the Agreement; (d) failure to maintain in confidence and trust, and not use without Megdal Associates's written consent, the trade secret embodied by Exhibit B to the Agreement; and (e) failure to furnish royalty reports in 2014 as required by paragraph 3.02 of the 2002 Agreement.

214.    La-Z-Boy's failures to perform in these regards each constitute a separate material breach of the 2002 Agreement that damaged Megdal Associates and otherwise caused it harm.

215.    La-Z-Boy has failed to cure its material breaches of the 2002 Agreement.

216.    Megdal Associates has sustained damages as a result of these breaches in an amount to be determined at trial.

## Count II

### *(Infringement of the '439 Patent)*

217.    Megdal Associates repeats and reasserts all allegations contained in Paragraphs 1 to 216 above as if they were stated in full herein.

218.    Megdal Associates is a co-owner of U.S. Patent No. 7,017,439, titled "Adjusting Device."  See Exhibit F hereto.

219.    Megdal Associates owns the '439 patent with Dewert.

220.    The '439 patent is in full force and effect.

221.    La-Z-Boy has received notice of the '439 patent under paragraph 3.01 of the 2002 Agreement with Megdal Associates (Exhibit A), and has otherwise been actually aware of the '439 patent, since just before its issuance.  See Exhibit G hereto.

222.   On information and belief, La-Z-Boy has even marked its power motion furniture with the '439 patent number in the past.

223.   La-Z-Boy was required to mark its power motion furniture with the '439 Patent number under paragraph 10.00 of the 2002 Agreement.  See Exhibit A, 2002 Agreement, para. 10.00.

224.   Under a 2003 Agreement between Megdal and Dewert, neither party requires "the consent of the other in order to take action to prosecute an infringement of the ['439] Patent", and in fact each party can "act independently to protect the ['439] Patent from unauthorized use and infringement . . ."

225.   In 2013, La-Z-Boy contended that so long as it installs its electrically powered drive system under the seat of its motion furniture products, it is not obligated to pay any royalties to Megdal Associates under the 2002 Agreement.

226.   On information and belief, the drive system in La-Z-Boy's 100 power motion furniture products is placed under the seat.

227.   On information and belief, La-Z-Boy is incorrect in its 2013 contention.

228.   To the extent that La-Z-Boy is correct in this contention, which it is not, this would likewise mean, as a matter of law, that La-Z-Boy was never licensed under Megdal Associates' patents for the 100 products using a motorized drive system that is placed under the seat.

229.   La-Z-Boy's products using the TiMOTION Design that have been and are currently being offered for sale and sold infringe one or more of the claims of the '439 patent.

230.   By having made, sold and/or offered to sell power motion furniture products using the TiMOTION Design in this judicial district and elsewhere, La-Z-Boy has been engaged in

and/or has induced others to engage in acts of infringement of one or more of the claims of the '439 patent, literally or under the doctrine of equivalents.

231.    Such unlawful infringing activity by La-Z-Boy is continuing and will continue unless enjoined by this Court.

232.    On information and belief, at the time that La-Z-Boy first offered for sale and sold its power motion furniture products using the TiMOTION Design, La-Z-Boy had neither sought nor obtained any opinion of counsel as to whether its offering for sale or sale of motion furniture products using the TiMOTION Design were infringing one or more of the claims of the '439 patent.

233.    On information and belief,  at the time that La-Z-Boy first offered for sale and sold its power motion furniture products using the TiMOTION Design, La-Z-Boy was aware that if it sold a product covered by one or more claims of the '439 patent, that it either had to pay Megdal Associates a royalty under the 2002 Agreement for such a product or else it would be an infringer of the '439 patent.

234.    On information and belief, despite being aware that if it sold a product covered by one or more claims of the '439 patent, it either had to pay Megdal Associates a royalty for such a product or else it would be an infringer of the '439 patent, La-Z-Boy never sought an opinion of counsel as to whether its products using the TiMOTION Design infringed the '439 patent *until after* Megdal Associates asked La-Z-Boy in 2013 why it was not paying a royalty to Megdal Associates for such sales.

235.    On information and belief, prior to 2013, La-Z-Boy never sought nor obtained an opinion from counsel about whether the '439 Patent is invalid or unenforceable.

236.     La-Z-Boy's acts of infringement have been knowing and willful, and have caused Megdal Associates to suffer damage in an amount to be proven at trial. Unless and until La-Z-Boy is enjoined by this Court from further infringement, Megdal Associates will continue to suffer damages and irreparable injury.

### Count III

*(Accounting)*

237.     La-Z-Boy repeats and reasserts all allegations contained in Paragraphs 1 through 236 above as if they were stated in full herein.

238.     The 2002 Agreement required La-Z-Boy to do a number of things as conditions to maintaining a license to sell LICENSED PRODUCTS, including pay royalties due under the terms of the agreement.

239.     The 2002 Agreement required La-Z-Boy to pay all royalties due and owing on a quarterly basis, provide an accounting of all LICENSED PRODUCTS sold by La-Z-Boy and permit annual audits of its records.  Exhibit A, at paragraph 3.02.

240.     La-Z-Boy failed and refused to perform these obligations under the 2002 Agreement.

241.     As a result, Megdal Associates is entitled to a judgment that La-Z-Boy has breached the 2002 Agreement, and compelling La-Z-Boy to provide a full and complete, itemized financial accounting of all sales of LICENSED PRODUCTS, payment of all amounts due and owing, together with back interest, and requiring that La-Z-Boy make all records affecting royalty payments available for Megdal Associates or its agent to audit.

## Count IV

### *(Declaratory Judgment of Megdal's Ownership of Improvements under the 2002 Agreement)*

242.     Megdal Associates repeats and reasserts all allegations contained in Paragraphs 1 to 241 above as if they were stated in full herein.

243.     The 2002 Agreement provides that *"[i]mprovements of any type* made by La-Z-Boy or any third party acting on its behalf to the TRADE SECRETS AND INVENTIONS shall be the exclusive property of Megdal [Associates], and are hereby assigned to Megdal[.]" Exhibit A at paragraph 9.01.  Emphasis added.

244.     This language qualifies as language of a present assignment of future improvements "of any type," and any patents thereon.

245.     La-Z-Boy had its outside counsel file for a group of U.S. and foreign counterpart patents and patent applications that disclose and/or claim "improvements of any type" within the meaning of paragraph 9.01 of the 2002 Agreement.

246.     At all materials times since 2002, La-Z-Boy was aware of paragraph 9.01 of the 2002 Agreement.

247.     At all material times since 2002, La-Z-Boy was aware that "improvements of any type" under paragraph 9.01 were owned by Megdal Associates by operation of law.

248.     At all material times since 2002, La-Z-Boy was aware that because "improvements of any type" under paragraph 9.01 were owned by Megdal Associates by operation of law, so too were all patents thereon.

249.     U.S. Patent No. 8,608,240 (the "'240 patent") was issued on December 10, 2013 after being prosecuted by counsel for La-Z-Boy. The '240 patent is attached as Exhibit H.

250.    U.S. Patent No. 8,459,732 (the "'732 patent") was issued on June 11, 2013 after being prosecuted by counsel for La-Z-Boy. The '732 patent is attached as Exhibit I.

251.    U.S. Patent No. 8,366,188 (the "'188 patent") was issued on February 5, 2013 after being prosecuted by counsel for La-Z-Boy. The '188 patent is attached as Exhibit J.

252.    U.S. Patent No. 8,506,009 (the "'009 patent") was issued on August 13, 2013 after being prosecuted by counsel for La-Z-Boy. The '009 patent is attached as Exhibit K.

253.    U.S. Patent No. 6,896,323 (the "'323 patent") was issued on May 24, 2005 after being prosecuted by counsel for La-Z-Boy. The '323 patent is attached as Exhibit L.

254.    U.S. Patent No. 6,893,085 (the "'085 patent") was issued on May 17, 2005 after being prosecuted by counsel for La-Z-Boy. The '085 patent is attached as Exhibit M.

255.    U.S. Patent Application Serial No. 12/759,267 (the "'267 application") was filed on April 13, 2010 by counsel for La-Z-Boy.  A Notice of Allowance and Issue Fee Due was issued for the claims of the '267 application on June 30, 2014.  The specification, drawings and allowed claims of the '267 application are attached hereto as Exhibit N.  On information and belief, La-Z-Boy intends to pay the issue fee for the '267 application.  On information and belief, an issued patent will result from the payment of an issue fee to the U.S. Patent and Trademark Office.

256.    U.S. Patent Application Serial No. 13/076,479 (the "'479 application") was filed on March 31, 2011, and is awaiting examination by the U.S. Patent and Trademark Office.  The specification, drawings and original claims are attached hereto as Exhibit O.

257.    U.S. Patent Application Serial No. 13/611,873 (the "'873 application") was filed on Sept. 12, 2012, and is awaiting examination by the U.S. Patent and Trademark Office. The specification, drawings and original claims are attached hereto as Exhibit P.

258.    The '240 patent, the '732 patent, the '188 patent, the '009 patent, the '323 patent, the '085 patent, the '267 application and the '479 application, and all foreign counterpart patents and patent applications thereto, disclose and/or claim "improvements of any type" within the meaning of paragraph 9.01 of the 2002 Agreement.

259.    During communications between counsel for Megdal Associates and counsel for La-Z-Boy in 2013, Megdal Associates contended that La-Z-Boy had made itself and/or had others acting on its behalf make "Improvements of any type" within the meaning of paragraph 9.01 of the 2002 Agreement, such that these improvements and all of the foregoing patents and patent applications thereon are owned solely by Megdal Associates.

260.    Megdal Associates has demanded that La-Z-Boy pay royalties for La-Z-Boy's sales of the 100 power motion furniture products, as they are and include among other things "Improvements of any type" within the meaning of paragraph 9.01 of the 2002 Agreement and are covered by one or more claims of the foregoing patents.

261.    La-Z-Boy has denied that it owes any royalty payments to Megdal Associates for La-Z-Boy's sale and offering for sale of La-Z-Boy's 100 products.  Among other contentions, according to La-Z-Boy these 100 products and the patents thereon are not and do not include "Improvements of any type" within the meaning of paragraph 9.01 of the 2002 Agreement.

262.    On information and belief, rather than acknowledge that the 100 power products that it has offered for sale and sold are or include "Improvements of any type" under paragraph 9.01 of the 2002 Agreement, La-Z-Boy has filed and/or has left of record assignment and other legal instruments purporting to establish at the U.S. Patent and Trademark Office and in foreign patent offices that La-Z-Boy, and not Megdal Associates, is the owner of these patents and patent applications directed to improvements.

263.    An actual controversy exists between Megdal Associates and La-Z-Boy as to whether these U.S. and foreign counterpart patents and patent applications disclose and/or claim "Improvements of any type" within the meaning of paragraph 9.01 of the 2002 Agreement, and have therefore been owned by Megdal Associates by operation of law. As such, this Court should enter a judgment that these U.S. patents, U.S. patent applications, and their respective foreign counterparts are and have been owned by Megdal Associates per section 9.01 of the 2002 Agreement, and order La-Z-Boy to correct the record of title to the same in all applicable patent offices.

### Count V

### *(Patent Infringement)*

264.    Megdal Associates repeats and reasserts all allegations contained in Paragraphs 1 to 263 above as if they were stated in full herein.

265.    One or more claims of each of the '240, the '732, the '188, the '009, and the '323 patents, read onto at least one style of La-Z-Boy's 100 powered footrest products that has been and/or that now is being offered for sale and sold by La-Z-Boy.

266.    As a result of the foregoing, and because Megdal Associates owns the '240, the '732, the '188, the '009, and the '323 patents, La-Z-Boy has been and continues to be infringing the foregoing patents.

267.    By having made, sold and/or offering to sell at least the products listed in and attached hereto as Exhibit Q in this judicial district and elsewhere, La-Z-Boy has been engaged and/or has induced others to engage in acts of infringement of the '240, the '732, the '188, the '009, and the '323 patents, literally or under the doctrine of equivalents.

268.     Such unlawful infringing activity by La-Z-Boy is continuing and will continue unless enjoined by this Court.

269.     La-Z-Boy has had actual knowledge of the '240, the '732, the '188, the '009, and the '323 patents since each issued, and of the fact that one or more of the claims read on one or more of the 100 power products sold by La-Z-Boy over the past couple of years.

270.     La-Z-Boy has intended that the '240, the '732, the '188, the '009, and the '323 patents read on one or more of the 100 power products sold by La-Z-Boy over the past couple of years.

271.     La-Z-Boy's offering for sale and sale of these 100 products over the past couple of years constitute patent infringement since Megdal Associates owns the '240, the '732, the '188, the '009, and the '323 patents.

272.     Given La-Z-Boy's knowledge and intent as set forth herein, and its lack of any good faith basis at relevant times for believing that the 100 products are not "improvements of any type" under paragraph 9.01 of the 2002 Agreement, and given Megdal Associates' ownership of the '240, the '732, the '188, the '009, and the '323 patents, La-Z-Boy's patent infringement has been willful.

273.     La-Z-Boy's infringement has further caused Megdal Associates to suffer damage in an amount to be proven at trial and irreparable injury. Unless and until La-Z-Boy is enjoined by this Court from further infringement, Megdal Associates will continue to suffer damages and irreparable injury.

## Count VI

### *(Misappropriation of Trade Secrets Under Florida Statutory Law)*

274.     Megdal Associates repeats and reasserts all allegations contained in Paragraphs 1 to 273 above as if they were stated in full herein.

275.     Megdal Associates owns secret information, including without limitation the design and design information shown on Exhibit B to the parties' 2002 Agreement (Exhibit A hereto).

276.     At all material times, Megdal Associates took reasonable steps to protect the secrecy of the design shown on Exhibit B to the parties' 2002 Agreement (Exhibit A hereto).

277.     The Agreement between Megdal Associates and La-Z-Boy precludes La-Z-Boy from using trade secret information, except with the consent of Megdal Associates and only in connection with the sale of LICENSED PRODUCTS.  Exhibit A, at paragraph 6.01.

278.     Consequently, La-Z-Boy knew and had reason to know that its knowledge of Megdal Associates's trade secret information was acquired under circumstances giving rise to a duty in La-Z-Boy to maintain its secrecy or limit use of the design and design information described in Exhibit B to the parties' 2002 Agreement (Exhibit A hereto).

279.     Despite being contractually obligated not to use Megdal's trade secret information unless with the consent of Megdal Associates and in connection with the sale of LICENSED PRODUCTS (products on which La-Z-Boy paid a royalty as set forth in paragraph 3.00 of the Agreement), on information and belief, La-Z-Boy, either directly or indirectly, has unlawfully used the trade secrets shown on Exhibit B to the 2002 Agreement to develop and/or sell products using the TiMOTION Design power drive system, which La-Z-Boy then sold to the public.

280.     The use of Megdal Associates' trade secret information in this manner constitutes a misappropriation of Megdal Associates' trade secrets under the Florida Uniform Trade Secrets Act, Fla. Stat. §§ 688.001 - .004.

281.    La-Z-Boy's acts of misappropriation as set forth herein have caused Megdal Associates to suffer damage in an amount to be proven at trial, and irreparable injury, including but not limited to lost profits and good will, and such acts have further caused La-Z-Boy to be wrongfully and unjustly enriched.

282.    Unless and until LA-Z-BOY is enjoined by this Court from further misappropriation, Megdal Associates will continue to suffer damages and irreparable injury, and La-Z-Boy will continue to unlawfully profit from its wrongful conduct and be unjustly enriched thereby.

## Jury Demand

Megdal Associates demands a trial by jury on all issues so triable.

## Request for Relief

**WHEREFORE**, Megdal Associates urges the Court to grant the following relief:

A.    Entry of judgment in favor of Megdal Associates and against La-Z-Boy on all counts in this Complaint, in an amount to be determined at trial, but at least in an amount that exceeds the jurisdictional limits of this Court;

B.    Entry of judgment ordering La-Z-Boy to provide Megdal Associates with proper accounting under the 2002 Agreement;

C.    Entry of judgment ordering that La-Z-Boy perform its duties under the terms of the 2002 Agreement;

D.    Entry of judgment that La-Z-Boy has infringed the '439 patent;

E.    Entry of judgment ordering that the '240 patent and all of its foreign counterpart patents and patent applications are and have been owned by Megdal Associates per section 9.01 of the 2002 Agreement, and ordering La-Z-Boy to correct the record of title to the same in all applicable patent offices.

F.     Entry of judgment ordering that the '732 patent and all of its foreign counterpart patents and patent applications are and have been owned by Megdal Associates per section 9.01 of the 2002 Agreement, and ordering La-Z-Boy to correct the record of title to the same in all applicable patent offices.

G.     Entry of judgment ordering that the '188 patent and all of its foreign counterpart patents and patent applications are and have been owned by Megdal Associates per section 9.01 of the 2002 Agreement, and ordering La-Z-Boy to correct the record of title to the same in all applicable patent offices.

H.     Entry of judgment ordering that the '009 patent and all of its foreign counterpart patents and patent applications are and have been owned by Megdal Associates per section 9.01 of the 2002 Agreement, and ordering La-Z-Boy to correct the record of title to the same in all applicable patent offices.

I.     Entry of judgment ordering that the '323 patent and all of its foreign counterpart patents and patent applications are and have been owned by Megdal Associates per section 9.01 of the 2002 Agreement, and ordering La-Z-Boy to correct the record of title to the same in all applicable patent offices.

J.     Entry of judgment ordering the that '085 patent and all of its foreign counterpart patents and patent applications are and have been owned by Megdal Associates per section 9.01 of the 2002 Agreement, and ordering La-Z-Boy to correct the record of title to the same in all applicable patent offices.

K.     Entry of judgment ordering the that '267 application and all of its foreign counterpart patents and patent applications are and have been owned by Megdal Associates per section 9.01 of the 2002 Agreement, and ordering La-Z-Boy to correct the record of title to the

same in all applicable patent offices.

L.      Entry of judgment ordering the that '479 application and all of its foreign counterpart patents and patent applications are and have been owned by Megdal Associates per section 9.01 of the 2002 Agreement, and ordering La-Z-Boy to correct the record of title to the same in all applicable patent offices.

M.      Entry of judgment ordering the that '873 application and all of its foreign counterpart patents and patent applications are and have been owned by Megdal Associates per section 9.01 of the 2002 Agreement, and ordering La-Z-Boy to correct the record of title to the same in all applicable patent offices.

N.      Entry of judgment that La-Z-Boy has infringed the '240 patent;

O.      Entry of judgment that La-Z-Boy has infringed the '732 patent;

P.      Entry of judgment that La-Z-Boy has infringed the '188 patent;

Q.      Entry of judgment that La-Z-Boy has infringed the '009 patent;

R.      Entry of judgment that La-Z-Boy has infringed the '323 patent;

S.      A determination that, pursuant to 35 U.S.C. § 284, Megdal Associates be awarded up to three times the amount of damages found or assessed, for La-Z-Boy's willful infringement of Megdal Associates' patent rights, and that pursuant to 35 U.S.C. §285 Megdal Associates be awarded attorney's fees, costs and expenses for an exceptional case;

T.      A finding that La-Z-Boy has misappropriated Megdal Associates' trade secrets, and a finding that La-Z-Boy has done so willfully and maliciously, and enter judgment and an Order for a corresponding disgorgement of La-Z-Boy's profits for sales of the TiMOTION-based power motion furniture due to La-Z-Boy's unjust enrichment caused by the misappropriation, plus any Megdal Associates' actual loss that is not taken into account in calculating the award of

La-Z-Boy's disgorged profits, plus exemplary damages of twice the amount of the foregoing, and attorneys' fees, all as provided for under Fla. Stat. §§ 688.004 and 688.005.

U.      To the extent that La-Z-Boy has underpaid Megdal Associates for royalties due and owing under the Agreement, and has done so by 10% or more of the actual royalties due and owing, an award of prejudgment interest at the rate of 8% per annum, pursuant to paragraph 5.00 of the 2002 Agreement, as well as "all costs and expenses reasonably related to identifying and rectifying the deficiency," as set forth in paragraph 5.00 of the Agreement; and

V.      Enter injunctive relief to stop La-Z-Boy from infringing Megdal Associates' patents, and from misappropriating its trade secrets, and any other appropriate form of equitable relief.

W.      Such other and further relief as is just and proper.

DATED:  August  1, 2014                    Respectfully submitted,

                                           **JONES, FOSTER, JOHNSTON & STUBBS, P.A.**


                                           By: /s/ Scott G. Hawkins
                                                Scott G. Hawkins (Florida Bar No. 0460117)
                                                James C. Gavigan, Jr. (Florida Bar No. 0085909)
                                                Flagler Center Tower
                                                505 South Flagler Drive, Suite 1100
                                                West Palm Beach, Florida 33401
                                                Telephone:   (561) 659-3000
                                                Facsimile:    (561) 650-5300
                                                shawkins@jonesfoster.com
                                                jgavigan@jonesfoster.com


                                           OF COUNSEL:

                                           **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**
                                                Ronald J. Schutz
                                                Jonathan J. Marcus
                                                601 Lexington Avenue, Suite 3400
                                                New York, NY 10022-4611
                                                Telephone:   (212) 980-7400
                                                Facsimile:    (212) 980-7499
                                                RJSchutz@rkmc.com
                                                JJMarcus@rkmc.com
                                                *Application for Admission Pro Hac Vice
                                                Forthcoming*


                                           ***Attorneys for Plaintiff
                                           Megdal Associates LLC***


                                           ***JURY TRIAL DEMANDED***